# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

IN RE:                              )        Case Nos. 02-CV-72-H(M)
                                    )             **Lead Case**
WILLIAMS SECURITIES                 )
LITIGATION                          )
                                    )
                                    )        **FILED**
                                    )
                                    )        JUL   8 2002
                                    )
                                    )        Phil Lombardi, Clerk
                                             **U.S. DISTRICT COURT**

## ORDER

This matter comes before the Court on the motions to appoint lead plaintiff and lead

counsel, filed on April 1, 2002 (Docket Nos. 16, 17, 19, 20, 25, 26, 34, 35, 38, 39). The Court

issued an order on June 21, 2002 (Docket No. 123) consolidating the four remaining related

cases with Case No. 02-CV-72-H(M) and bifurcating the action into the following subclasses:

purchasers of Williams Communications Group, Inc. ("WCG") securities and purchasers of

Williams Companies, Inc. ("WMB") securities. As contemplated by the Private Securities

Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(ii) and 15 U.S.C. §

77z-1(a)(3)(B)(ii), which requires the Court to appoint the most adequate plaintiff as the lead

plaintiff for the consolidated action "as soon as practicable" after the decision on the motions to

consolidate is rendered, the Court will now address the motions for appointment of lead plaintiff

and lead counsel.

The Court has carefully reviewed the briefs submitted by the five lead plaintiff movants,

and, for the reasons set forth below, hereby orders the appointment of Alex Meruelo as the lead

plaintiff for the subclass of purchasers of WCG securities and HGK Asset Management ("HGK")

1



as lead plaintiff for the subclass of purchasers of WMB securities. The Court further orders the appointment of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), Weiss & Yourman, and Morrel West Saffa Craige & Hicks Inc ("Morrel West") as counsel for the subclass of purchasers of WCG securities and Schoengold & Sporn and the Seymour Law Firm as counsel for the subclass of purchasers of WMB securities.

I

The PSLRA sets forth detailed procedures for the appointment of lead plaintiff(s) in a private class action arising under the securities laws. 15 U.S.C. § 78u-4(a).[1] Among those procedures is the requirement that the named plaintiff in the action must file notice within twenty days of filing suit to inform potential class members of their right to move to be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Such notice must be published "in a widely circulated national business-oriented publication or wire service." Id. Not later than sixty days after the date on which this notice is published, any member of the putative class may move the court to be appointed lead plaintiff of the class. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

The PSLRA then requires the Court to appoint a lead plaintiff for the class after determining which applicant is "most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B). In determining which applicant should be named lead plaintiff, the Court must accept the presumption that the most adequate plaintiff in any private action is the person(s) who: (1) has either filed the complaint or made a motion in response to a

---

[1] The PSLRA amended both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by adding identical sections to both acts, Section 27 to the Securities Act and Section 21D to the Exchange Act. See 15 U.S.C. § 77z-1(a)(3) and 15 U.S.C. § 78u-4(a)(3). For convenience, the Court will cite only to the Exchange Act when referring to the PSLRA.

2

notice; (2) in the determination of the Court, has the largest financial interest in the relief sought

by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil

Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Under the PSLRA, the Court's determination of the "most adequate plaintiff" may be

rebutted only upon proof that the presumptive lead plaintiff either: (1) will not fairly and

adequately protect the interests of the class; or (2) is subject to unique defenses that render such

plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## II

### A. Appointment of Lead Plaintiff for the WCG Subclass

On January 29, 2002, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(A)(i)(I), the

first notice of the pendency of this class action was published in a national business-oriented wire

service. See Press Release, Milberg Weiss Bershad Hynes & Lerach LLP, Milberg Weiss

Announces Class Action Suit Against Williams Companies, Inc. and Williams Communications

Group, Inc. (Jan. 29, 2002) (Seymour Decl. Ex. A). Within sixty days following the date of that

publication, on April 1, 2002, lead plaintiff applications were submitted by the following

individuals or groups, now seeking to be appointed lead plaintiff for the subclass of purchasers of

WCG securities ("WCG Subclass"): Mr. Meruelo;[2] Blaine Watkins, Bruce and Kathleen Smith

and Bruce Russell ("the Watkins Group"); and Market Street Securities, Inc. ("Market Street").[3]

---

[2]    The lead plaintiff application of Mr. Meruelo was originally submitted on behalf of
Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronayn ("the Meruelo
Group"). In its June 6, 2002 memorandum, however, the Meruelo Group stated that, in light of
the bifurcation of the action into subclasses of WMB and WCG securities purchasers, the group
sought to put forward only Alex Meruelo as the proposed lead plaintiff.

[3]    Douglas E. Miller and Carol Moore, purchasers of WMB and WCG securities, jointly
filed a motion seeking to be appointed lead plaintiff on April 1, 2002 (Docket Nos. 22 and 23).
Mr. Miller and Ms. Moore have not submitted the additional briefing ordered by the Court to

Because all three lead plaintiff motions were submitted within the time period established by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), all applicants have satisfied the first requirement of the statutory test for determining the presumptive "most adequate plaintiff."

The Court must next determine the person or group of persons who "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The PSLRA, however, does not specify the procedure for the Court to follow in making this determination. See In re Enron Sec. Litig., 2002 WL 530588, at *7 (S.D. Tex. 2002); see also In re Nice Sys. Sec. Litig., 188 F.R.D. 206, 217 (D. N.J. 1999). Several courts addressing this question have applied the four-factor test articulated by the district court in Lax v. First Merchs. Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). See, e.g., Enron, 2002 WL 530588, at *7; In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); Nice Sys., 188 F.R.D. 206, 217 (D.N.J. 1999). The four Lax factors used to determine the largest financial interest are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. Lax, 1997 WL 461036, at *5. "These factors are useful because they look to relatively objective indicators, such as the number of shares purchased or sold, rather than to the ultimate question of damages." Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146 (N.D. Cal. 1999). Notably, one of the WCG Subclass movants in this case, despite the Court's request at the April 12, 2002 hearing for clear and specific information regarding loss calculations, failed to provide information stated in these terms. Accordingly, the Court has

---

support their motion, and, accordingly, the Court deems the motion to have been withdrawn. Westmonte Plaza Inc. (Docket No. 28) and Darryl Abramowitz (Docket Nos. 30 and 31) also filed lead plaintiff applications on behalf of WCG securities purchasers. Both applications, however, were formally withdrawn and, therefore, will not be addressed here.

4

focused its analysis on the movants' claimed losses, the only common denominator addressed by each of the WCG Subclass movants.[4]

On the basis of the losses claimed by the lead plaintiff movants, Mr. Meruelo appears to be the lead plaintiff applicant with the largest financial interest in the outcome of the litigation. The losses claimed by the respective movants are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| Alex Meruelo | $3,905,136.80[5] |
| Market Street | $2,300,000.00 |
| The Watkins Group | $ 224,000.00 |

Market Street argues, however, that Mr. Meruelo's losses are overstated and that instead Market Street is the movant with the largest financial interest. Market Street attacks Mr. Meruelo's loss calculation on several grounds, claiming it is overstated because: (1) Mr. Meruelo made errors in his certifications and loss calculations; (2) Mr. Meruelo improperly

---

[4] The Court recognizes its obligation under the PSLRA to "determine" the plaintiff with the "largest financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (requiring that the "most adequate plaintiff" be the person or persons that, "in the determination of the court, has the largest financial interest in the relief sought by the class") (emphasis added); see also Aronson, 79 F. Supp. 2d at 1157. The Court further recognizes, however, that the statutory scheme for the speedy resolution of the lead plaintiff question makes it undesirable for courts to prejudge damages through an extensive fact-finding process. See Aronson, 79 F. Supp. 2d at 1157. The Court has reviewed the numerous motions and supporting memoranda addressing the lead plaintiff question and generally accepts the representations of the movants as true. Based on these representations and the unnecessary delay that would be occasioned by further proceedings, Market Street's motion for oral argument (Docket No. 119) on these issues is hereby denied.

[5] See Notice of Submission of Corrected Loss Calculation and Trading Data by Alex Meruelo; Declaration of Behram V. Parekh, filed June 6, 2002, ("Corrected Loss Calculation").

5

included purchases after the disclosure of fraud; and (3) Mr. Meruelo improperly calculated his losses by using the average trading price of WCG during the 90-day period following the close of the class period. The Court will address each of Market Street's criticisms in turn below.[6]

First, Market Street criticizes Mr. Meruelo's certification and therefore his loss calculation, arguing that the certification listed "numerous trades in the common stock of WCG at prices outside the range at which WCG traded on those dates." Market Street then calculates the amount by which Mr. Meruelo's losses would be reduced if the Court rejected all trades listed on the certification at prices outside the range at which the stock traded on those dates, arguing that Mr. Meruelo's claimed losses should be reduced by $1,128,665.00.

On June 6, 2002, however, Mr. Meruelo submitted a Corrected Loss Calculation and actual trading data supporting his motion for appointment as lead plaintiff. The revised loss calculation was submitted to correct the following discrepancies: (1) the trading data attached to Mr. Meruelo's certification reflected settlement dates rather than trading dates for the stock; and (2) the trading data attached to Mr. Meruelo's certification included the commission charge as part of the price of the securities, rather than reflecting just the trade price of the securities. After correcting for these errors, Mr. Meruelo's losses amount to $3,905,136.80; a total more than the

---

[6] In its June 6, 2002 Response Memorandum, Market Street also argued that Mr. Meruelo's losses were overstated because the Meruelo Group and Mr. Meruelo: (1) failed to assign value to Mr. Paronyan's shares; and (2) improperly aggregated the claims of the individuals in the Meruelo Group. Because the other individual lead plaintiff applicants in the former "Meruelo Group" have withdrawn their applications in support of Mr. Meruelo, the Court need not address these arguments.

amount stated in Mr. Meruelo's original submission.[7]  The Court has reviewed the revised loss

calculations and supporting trading data and finds that the errors identified by Market Street (and

certain other lead plaintiff movants) have been sufficiently addressed.  Accordingly, the Court

finds unnecessary any reduction of Mr. Meruelo's loss calculation on the basis that the trade

prices stated on the certification are in error.[8]

Market Street next claims that Mr. Meruelo's losses are overstated because his

certification includes purchases of WCG securities effected after the disclosure of the fraud.

Market Street argues that Mr. Meruelo's purchases of 171,700 shares of WCG stock on January

29, 2002 should be excluded from his loss calculation because the WMB press release describing

the contingent guarantee of WCG debt was issued at 7:31 a.m. on January 29, 2002, before the

market opened for trading.

Mr. Meruelo contends, however, that the January 29 purchases were appropriately

included in his loss calculation because the class period alleged in the complaints filed in this

action end on and include January 29, 2002.  See, e.g., Cali, et al. v. Williams Cos. Inc., et al.,

Compl. at ¶ 18 ("Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

_____

[7] Mr. Meruelo's Corrected Loss Calculation explains that the increase in the amount of
loss is due to the inadvertent exclusion from his original submission of purchases that were
"settled" after the end of the class period but "transacted" within the class period.

[8] The Court finds that the corrected errors in Mr. Meruelo's certification and loss
calculation do not provide a sufficient basis for denying his motion to be appointed lead plaintiff.
Cf. Amended Memo. Of Law in Opp'n to the Competing Lead Plaintiff Motions and in Further
Support of the Motion of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis
Paronyan for Consolidation, Appointment as Lead Plaintiff and For Approval and Selection of
Lead and Liaison Counsel (4/19/02) ("The fact that none of the three certifications that were filed
by Market Street Securities was accurate, in and of itself, provides additional grounds for
denying its motion.").

otherwise acquired the securities of WMB and/or WCG between July 24, 2000 and January 29, 2002 inclusive (the 'Class Period') and who were damaged thereby") (emphasis added). Mr. Meruelo further contends that, in addition to the press release purportedly issued at 7:31 a.m., WCG issued its own press release on January 29, which may have contradicted WMB's prior statements. Mr. Meruelo argues that these conflicting press releases created confusion in the market regarding WMB and WCG's securities.

The Court finds that a determination regarding whether the shares purchased by Mr. Meruelo on January 29, 2002 occurred after the market became aware of the alleged fraud requires an extended inquiry and factual determination as to the exact moment investors were on notice of the negative information. The Court finds that such an inquiry is inappropriate and unnecessary at this stage of the litigation and, accordingly, declines to exclude Mr. Meruelo's January 29, 2002 purchases of WCG stock from Mr. Meruelo's loss calculation on that basis.

Finally, in addition to the criticisms of the trading prices stated in Mr. Meruelo's certification, Market Street also attacks the method by which Mr. Meruelo calculates his losses. Market Street argues that Mr. Meruelo's loss calculation, based on the PSLRA'S 90-day average trading price, 15 U.S.C. § 78u-4(e), is an inappropriate measure of loss at the lead plaintiff appointment stage.[9] Instead, Market Street argues that the appropriate measure of loss would be one based on the closing price for WCG common stock on January 29, 2002, the day the alleged fraud was disclosed. Market Street further argues that Mr. Meruelo's use of the 90-day average

---

[9] The PSLRA provides a limit on the amount of damages that can be recovered in a private action where the plaintiff seeks to establish damages by reference to the market price of a security. 15 U.S.C. § 78u-4(e)(1). That limit is calculated by determining "the mean trading price of [the] security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Id.

8

trading price is an attempt to claim "more than $1,700,000 worth of losses that occurred well after the disclosure of the fraud and the end of the class period."

Market Street cites the district court's decision in In re Ribozyme Pharms., Inc. Sec. Litig., 192 F.R.D. 656, 661 (D. Colo. 2000), to support its position that the 90-day average trading price should not be used to determine the lead plaintiff with the largest financial interest in the litigation. In Ribozyme, the court found that the loss calculation for the so-called "retention" plaintiffs was the value to which the stock price fell at the end of the class period; the court also explicitly rejected the use of the 90-day average trading price as a method for calculating damages:

> The "Lead Plaintiffs" Group argues against this novel valuation method and states that it is error to read the PSLRA's "90-day bounce back" provision regarding the calculation of damages into the lead plaintiff provision regarding the largest financial interest. I agree that the determination of financial interest does not equate to damages. Damages is a term of art and a technical matter to be established by experts. The lead plaintiff provision in the PSLRA does not use the term "damages" but instead, "largest financial interest."

192 F.R.D. at 661.

The Court does not consider Ribozyme's analysis persuasive in light of the number of district courts relying upon the 90-day average trading price in comparing claimed losses. See, e.g., In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427 (E.D. Va. 2000) (using 90-day period after the close of the class period to determine largest financial interest); Steiner v. Nat'l Auto Credit, 1998 U.S. Dist. LEXIS 21804, at *12 (N.D. Ohio July 16, 1998) (using the "mean trading price," or the average of the daily trading price of the security "during the 90 day period," to determine the largest financial interest in the case).[10] In fact, the Court is unaware of any other

---

[10] The Ribozyme court stated that it relied on several non-published opinions in its district that have employed the "retention value" method for determining the largest financial interest pursuant to the PSLRA. See Ribozyme, 192 F.R.D. at 660 (citing In re New Era Networks, Inc. Sec. Litig., Civil Action No. 99-WM-473 (Colo. 1999); In re Samsonite Corp. Sec. Litig., Civil Action No. 98-K-1878 (Colo. 1998); In re Boston Chicken Sec. Litig., Civil

opinion holding that the "retention value" method is the only appropriate method of calculating damages.[11]

Moreover, the Court finds that Market Street failed to follow the directive at the April 12, 2002 hearing to articulate with clarity and specificity the bases and methods for calculating its own losses. Market Street's original certification and loss calculation, unlike those of other lead plaintiff movants, failed to provide sufficient information for the Court to analyze the basis for its claimed financial interest. Furthermore, despite its sharp criticism of other lead plaintiff movants' calculations, Market Street has not provided any additional information to supplement its original submission in the four rounds of briefing following its April 1, 2002 motion.

In accordance with the PSLRA, the Court finds that Mr. Meruelo is the WCG Subclass lead plaintiff movant with the "largest financial interest" in the outcome of the litigation. The Court's determination is based on the following findings: (1) Mr. Meruelo's loss calculations have survived scrutiny and are permissibly calculated using the 90-day average trading price under the PSLRA; (2) the Watkins Group's claimed losses are significantly less than those of Mr. Meruelo; and (3) the claimed losses of Market Street are also significantly less than those of Mr. Meruelo.

---

Action No. 97-WM-1308 (Colo. 1997); In re New Era of Networks, Inc. Sec. Litig., Civil Action No. 99-WM-1274 (Colo. 1999)). The Court finds that each of these four opinions is inapposite because none of them endorses the "retention value" method or even mentions how the largest financial interest was determined. See id. Furthermore, two of the cases, New Era, Civil Action No. 99-WM-473; and Samsonite, Civil Action No. 98-K-1878, involved unopposed motions for the appointment of lead plaintiff, thereby explaining the absence of any discussion regarding the appropriate method for determining which movant had the "largest financial interest."

[11] The Court finds Market Street's attacks on Mr. Meruelo's use of the 90-day average trading price notable given Market Street's failure to make the argument before final briefs were submitted on June 6, 2002. This failure is particularly perplexing in light of the number of lead plaintiff movants calculating "losses" and financial interest using that method.

10

Having determined that Mr. Meruelo has the largest financial interest in the outcome of the litigation, the Court turns to whether Mr. Meruelo satisfies the requirements of Fed. R. of Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Many courts agree, however, that a "wide-ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification. This inquiry, therefore, focuses on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4)." Lax, 1997 WL 461036, at *6 (internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d 427; Aronson, 79 F. Supp. 2d at 1158 (citations omitted) (holding that, at the lead plaintiff appointment stage, "all that is required is a 'preliminary showing' that the lead plaintiff's claims are typical and adequate.").

Market Street claims Mr. Meruelo's losses are not typical of those of the WCG Subclass under Rule 23(a) because Mr. Meruelo is subject to unique defenses as a result of his purchases of securities after the alleged disclosure of the fraud on January 29, 2002. In support of this position, Market Street quotes a brief purportedly filed by Mr. Meruelo's counsel, Milberg Weiss, on behalf of another client in an unrelated case. Market Street argues that Mr. Meruelo's purchases of WCG securities on January 29, 2002 are similar to the purchases of the lead plaintiff movant in Enron where the court determined the movant was subject to unique defenses and therefore was atypical because it purchased millions of shares of Enron stock after the disclosure of the fraud. Enron, 2002 WL 530588, at *22; see also Berwecky v. Bear, Stearns & Co., Inc., 197 F.R.D. 65 (S.D.N.Y. 2000) (holding that a person who increases his holding after

11

revelation of the fraud is subject to unique defenses that preclude him from serving as class representative); Kreindler v. Sambo's Rest., Inc., 1985 U.S. Dist. Lexis 23388 (S.D.N.Y. 1985) (same).

Mr. Meruelo contends that his purchases of WCG securities on January 29, 2002, the last day of the class period, can be distinguished from those of the lead plaintiff movant in Enron, the Florida State Board of Administration ("FSBA"). Mr. Meruelo explains that the FSBA's purchases of Enron securities were made on its behalf by its investment advisor, Alliance Capital Management Holding, well after the first Enron shareholder suits were filed against Enron and after the announcement of the SEC investigation into Enron.

Under Fed. R. Civ. P. 23(a)(3), the claims of the representative parties must be typical of those of the putative class. Typicality is achieved where the named plaintiff's claims arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." Enron, 2002 WL 530588, at *8 (citations omitted). Even though the typicality requirement is not satisfied when the "plaintiff's factual or legal stance is not characteristic of that of other members," id., at *13 (citations omitted), the existence of minor distinctions will not preclude the typicality requirement from being met, Olsten, 3 F. Supp. 2d at 296; see also Nice Sys., 188 F.R.D. at 217; Enron, 2002 WL 530588, at *13.

The Court finds that Mr. Meruelo's purchases of WCG stock on January 29, 2002, the first day the alleged fraud was disclosed, may be distinguished from the purchases of FSBA because the purchases of FSBA occurred "after the initial public disclosure regarding [its] overstatement of its assets and partnership liabilities, after the first suits in this consolidated action were filed, and after the SEC announced that it was investigating [the company]." Enron, 2002 WL 530588, at *22. In this case, the purchases upon which Market Street seeks to disqualify Mr. Meruelo occurred on January 29, 2002, the date the plaintiffs claim the first WMB

12

or WCG press release regarding the alleged fraud was issued. In <u>Enron</u>, the court found that FSBA's claims were atypical because, unlike this case, FSBA's purchases occurred so long after the first disclosure of the fraud that FSBA, unlike other investors, did not buy the stock relying upon either the market or statements by Enron or its agents.[12] The Court finds that Mr. Meruelo's purchases were not atypical so as to disqualify him from serving as lead plaintiff.

The Watkins Group, seeking to be appointed lead plaintiff on behalf of WCG bondholders, argues that its interests will not be adequately protected by Mr. Meruelo, or any other equity holder lead plaintiff. The Watkins Group objects on the following grounds: (1) WCG shareholders do not have standing to pursue claims on behalf of WCG bondholders; and (2) because the interests of WCG shareholders and WCG bondholders are divergent, the WCG bondholders will not be adequately represented by a shareholder lead plaintiff.

To the extent the Watkins Group's first argument relates to the typicality of Mr. Meruelo's claims, the Court finds that Mr. Meruelo's claims are typical because the claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See <u>Lax</u>, 1997 WL 461036, at *6 (N.D. Ill. 1997); <u>see also</u> <u>Enron</u>, 2002 WL 530588, at *13 ("When plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times.") (internal quotations omitted). Moreover, the Court finds that, insofar as the appointment of Mr. Meruelo

---

[12] The lead plaintiff movants, here, dispute whether the market, and Mr. Meruelo, had notice of the alleged fraud when the securities were purchased. As the Court explained above, an extended inquiry and factual determination into the exact moment investors were on notice is inappropriate and unnecessary at this stage of the litigation and will not be taken up here.

as WCG Subclass lead plaintiff presents standing issues, those issues can be resolved by the filing of an amended complaint.

The Watkins Group's second attack goes to the adequacy of Mr. Meruelo, or any shareholder lead plaintiff movant, to represent the interests of WCG bondholders. The Watkins Group, stressing the significance of the WCG bankruptcy, claims that it should also be appointed lead plaintiff in order to "ensure that the interests of bond purchasers are adequately represented and protected during any settlement negotiations, and particularly during any allocation of funds in the event of recovery." Watkins Group Reply Mem. (Jun. 6, 2002), at 4.

Under Fed. R. Civ. P. 23(a)(4), class representatives must adequately represent the interests of the putative class. This requirement is satisfied where: "(1) class counsel is qualified, experienced and generally able to conduct the litigation; (2) the class members do not have interests that are antagonistic to one another; and (3) the class has sufficient interest in the outcome of the case to ensure vigorous adequacy." Olsten, 3 F. Supp. 2d at 296 (citations and internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d at 435-36. In other words, "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." Nice Sys., 188 F.R.D. at 219.

The Court finds that Mr. Meruelo's representation meets the Rule 23(a)(4) standard for adequacy. First, the Court finds Milberg Weiss, Weiss & Yourman, and Morrel West, the counsel selected by Mr. Meruelo, to be qualified and experienced lawyers who are unquestionably capable of conducting the litigation on behalf of the WCG Subclass. Second, the Court finds that any problems due to alleged conflicts of interest between WCG's debt and equity holders amounts to mere speculation at the present time. At this stage of the litigation, the

14

holders of both types of securities have the common goal of establishing the omissions and misrepresentations allegedly made to the market. See generally Enron, 2002 WL 530588, at *13. The Court further finds that the inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in an unnecessary and undesirable weakening of the bargaining power of the WCG Subclass. See Nice Sys., 188 F.R.D. at 220 ("Representation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation.") (internal quotations omitted). Finally, the Watkins Group's contention that Mr. Meruelo, or another shareholder lead plaintiff, will not vigorously pursue the claims of the bondholder class members is unsubstantiated. The Court finds that Mr. Meruelo's own financial stake in the litigation provides an adequate incentive for him to vigorously prosecute the action on all fronts. See generally Nice Sys., 188 F.R.D. at 219.

The final issue with respect to the appointment of Mr. Meruelo as lead plaintiff is whether any lead plaintiff movant has successfully rebutted the presumption that Mr. Meruelo is the "most adequate plaintiff." Under the PSLRA, the presumptive lead plaintiff may only be rebutted upon proof that the plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Both Market Street's and the Watkins Group's arguments for the disqualification of Mr. Meruelo on the grounds that his claims are atypical or inadequate under Rule 23(a) may be construed as rebuttal challenges under the PSLRA. See id. The Court addressed and rejected these arguments above. Therefore, the Court finds that the presumption that Mr. Meruelo is the "most adequate plaintiff" for the subclass has not been rebutted. Accordingly, the Court hereby appoints Mr. Meruelo as the lead plaintiff for the WCG subclass.

15



## B. Appointment of Counsel for the WCG Subclass

The Court now turns to the approval of lead counsel for the WCG Subclass. As noted above, the Court finds that Mr. Meruelo's selections, Milberg Weiss, Weiss & Yourman, and Morrel West, are qualified, experienced counsel who will adequately represent the interests of the class. Accordingly, the Court approves Mr. Meruelo's selection of Milberg Weiss and Weiss & Yourman as co-lead counsel, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7 (noting the use of co-lead counsel should not result in increased attorneys' fees and expenses). The Court also approves Mr. Meruelo's selection of Tulsa law firm Morrel West as local counsel for the WCG Subclass.

## III

### A. Appointment of Lead Plaintiff for the WMB Subclass

On April 1, 2002, motions seeking lead plaintiff status were filed by HGK and Teamsters Local 710 Pension Fund and Health & Welfare Fund ("Local 710"); both movants now seek to be appointed lead plaintiff for the subclass of purchasers of WMB securities ("WMB Subclass"). HGK and Local 710 submitted motions, as required by the PSLRA, within sixty days from the January 29, 2002 publication of the notice of the pendency of this class action. See 15 U.S.C. § 78u-4(a)(A)(i)(II). The potential lead plaintiffs for the WMB Subclass, therefore, both satisfy the first requirement for becoming the presumptive "most adequate plaintiff."

The Court must next determine which movant "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The financial interest claimed by the two lead plaintiff movants for the WMB Subclass are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| HGK | $3,774,142.00 |
| Local 710 | $  146,166.00[13] |

As previously discussed, determining which lead plaintiff movant has the largest financial interest in the litigation is, generally, the most significant inquiry for the Court in appointing a lead plaintiff. See, e.g., Aronson, 79 F. Supp. 2d at 1157. In the case of the WMB Subclass, however, HGK's alleged losses dwarf those of Local 710, and Local 710 has failed to demonstrate that HGK's claimed WMB holdings or losses are erroneously calculated or otherwise overstated. Accordingly, the Court finds that HGK has the "largest financial interest in the outcome of the litigation." See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

Local 710 argues that it should be appointed a separate lead plaintiff for a subclass of WMB bondholders.[14] Asserting similar justifications as those argued by the Watkins Group, Local 710 contends that no shareholder lead plaintiff movant has the standing required to pursue claims on behalf of the bondholders, and that Local 710's interests will not be adequately represented by a shareholder lead plaintiff.[15]

---

[13] HGK's losses were suffered in connection with its purchase of shares of WMB common stock and were determined after deducting gains from the sale of its WCG shares received as dividends; Local 710's losses were suffered in connection of its purchases of WMB notes.

[14] In its memoranda addressing the appointment of lead plaintiff, Local 710 urges the Court to appoint it lead plaintiff of a separate subclass of purchasers of WMB notes. The Court denied Local 710's request for the creation of a separate subclass in its June 21, 2002 order (Docket No. 123), and will not address that issue again here.

[15] It is unclear whether Local 710's attack is based on the grounds of typicality and adequacy under Rule 23 or an attack on HGK as the presumptive lead plaintiff.

17

As noted above, in determining the most adequate plaintiff, the Court must address Rule 23(a)'s typicality and adequacy requirements. The Court finds that HGK's representation meets the Rule 23(a) standards for typicality and adequacy. First, the Court finds that HGK's claims are typical of the WMB bondholders because the claims asserted by HGK on behalf of the shareholder plaintiffs "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6. As discussed above, the Court finds that, to the extent the appointment of HGK as WMB Subclass lead plaintiff presents standing issues, those issues can also be resolved at the appropriate time by the filing of an amended complaint. Second, the Court finds that HGK's representation of the class is adequate for the reasons identified previously with respect to appointment of a lead plaintiff for the WCG Subclass because HGK: (1) has selected qualified and experienced counsel; (2) does not have any present conflicts of interest with the WMB bondholders; and (3) will vigorously prosecute the action.

Accordingly, because HGK (1) filed its lead plaintiff application within 60 days of the notice of the pendency of the action; (2) has been determined by the Court to have the largest financial interest in the litigation's outcome; and (3) satisfies the requirements of Rule 23, HGK is presumed to be the "most adequate" plaintiff. The Court finds that Local 710 has not successfully rebutted this presumption or otherwise shown that HGK cannot or will not adequately represent the class. Accordingly, the Court hereby appoints HGK as the lead plaintiff for the WMB Subclass.

## B. Appointment of Counsel for the WMB Subclass

The Court now turns to the approval of lead counsel for the WMB Subclass. The Court finds that HGK's selections, Schoengold & Sporn and the Seymour Law Firm, are qualified,

18

experienced counsel who will adequately represent the interests of the class. Accordingly, the Court hereby approves HGK's selection of Schoengold & Sporn and the Tulsa law firm, the Seymour Law Firm, as co-lead counsel for the subclass of purchasers of WMB securities, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7.


## IV

On March 15, 2002, the parties filed a Joint Stipulation and Proposed Scheduling Order to govern the timing of submissions following the entry of the Court's order appointing lead plaintiff and lead counsel. Pursuant to this Order, and in accordance with that Joint Stipulation, the Court hereby orders the following:

1. Lead Plaintiffs for the WCG and WMB Subclasses shall file consolidated amended complaints on behalf of their respective subclasses incorporating all causes of action on behalf of all putative subclass members no later than 45 days from this order;

2. Defendants shall have 45 days from service of the consolidated amended complaints to file responsive pleadings;

3. Lead Plaintiffs shall have 45 days to file any oppositions to the responsive pleadings; and

4. Defendants shall have 15 days to reply to Plaintiffs' opposition.

IT IS SO ORDERED.

This 8 TH day of July, 2002.

Sven Erik Holmes
United States District Judge

19

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

———————————————————x

In re: DaimlerChrysler AG Securities Litigation

———————————————————x

Civil Action No. 00-993/00-984/01-004-JJF

Consolidated Action

## DECLARATION OF ROLF STÜRNER

I, ROLF STÜRNER, declare as follows:

1.        I am a Professor of Law at the University of Freiburg, Germany. Defendants DaimlerChrysler AG, Jürgen Schrempp and Manfred Gentz ("Defendants") have retained me to render an opinion concerning the preclusive effect a German court would grant a judgment entered in a U.S. class action in any subsequent action brought by German shareholders who are residents of Germany and did not opt-out of the class. As explained below, in my opinion it is highly unlikely that a German court would recognize as binding against those German shareholders any judgment entered in a U.S. class action if those German shareholders do not receive notice and the opportunity to opt-out of the U.S. class action in a manner that strictly complies with the requirements of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, opened for signature Nov. 15, 1965, 20 U.S.T. 361, 1969 U.S.T. LEXIS 152 (the "Hague Service Convention"). I base my opinion on German constitutional law, general principles of German law and policy and German statutory law as well as on the Hague Service Convention as it has been applied in Germany.

## QUALIFICATIONS

2.          My curriculum vitae is attached as Exhibit A to this declaration.  I have

been a member of the full-time faculty of the University of Freiburg since 1992, having

previously served as a Professor of Law and Dean of the Law Faculty at the University of

Konstanz.  I have taught courses at the University of Freiburg in the areas of civil

procedure, international civil litigation and comparative law of civil procedure, served as

the Dean of the Law Faculty, and I currently serve as the Director of the Institute for

German and Comparative Civil Procedural Law.  I have also taught International Civil

Litigation as a visiting professor at Harvard Law School.  I have authored or co-authored

numerous scholarly articles and other writings in the areas of transnational civil

procedure.  See, e.g., Ernest C. Stiefel, Rolf Stürner, Astrid Stadler, The Enforceability of

Excessive US Punitive Damage Awards in Germany, 39 Am. J. Comp. L. 779-802

(1991); Rolf Stürner, Some European Remarks on a New Joint Project of the American

Law Institute and UNIDROIT, 34 Int. Lawyer 1071-1086 (2000); Geoffrey C. Hazard,

Jr., Rolf Stürner, Michele Taruffo, and Antonio Gidi, Fundamental Principles of

Transnational Civil Procedure, 33 N.Y.U. J. Int'l L. & Pol. 785 (2001); Rolf Stürner,

Transnational Civil Procedure: Discovery and Sanctions against Non-compliance,  Unif.

L. Rev. 2001-4, 871-886.  I recently served as the Co-reporter for the joint project of the

American Law Institute and Unidroit (International Institute for the Unification of Private

Law) for the project "Principles and Rules of Civil Procedure."  I am a founding co-editor

of the Zeitschrift für Zivilprozeß International (Journal for International Civil Procedure).

I have also been a speaker at numerous conferences, including the International

2

Conference of the Japanese Association for Civil Procedure, the Comparative Civil Procedure Conference of the British Institute of International and Comparative Law, and the U.S. Court of Federal Claims 20th Anniversary Conference.

<u>DISCUSSION</u>

3.        It is a well-settled principle of German law that judgments may not confer a negative preclusive effect on third persons when these third persons were not parties to litigation or had no fair opportunity to actively participate in the proceeding after correct service of process.  This principle is based on the rationale that a third person's constitutional right to be heard (German Constitution Art. 103[1]) is infringed by a detrimental judgment resulting from a procedure where the third person was not a party to the litigation.  According to these principles, German law does not grant final preclusive effect to judgments rendered in actions where an individual's right to be heard has been seriously compromised by a lack of "correct representation".  (German Constitutional Court, 51 Neue Juristische Wochenschrift 745 [1998]; <u>see also</u> German Code of Civil Procedure §§ 321a, 579[1][4]).  The eminent significance of the right to be heard has important consequences for the requirements for recognition and enforcement of foreign judgments.  Germany does not recognize foreign judgments rendered in actions where an individual's right to be heard has been infringed by a lack of "correct representation" (German Federal Supreme Court, 144 BGHZ 390, 393 [2000]; European Court of Justice, Krombach v. Bamberski 2000 ECR 1935 sub Nō 44) or by improper service of process (German Code of Civil Procedure § 328 Nō 2 and 4).

3

4.        German law makes no general provisions for a damages class action or any variation thereof as it exists in the United States. Forms of a representative action that are not really comparable are actions filed by a court-appointed representative of creditors or shareholders of companies under very special circumstances (§ 306 German Stock Corporation Law: compensation for a minority of shareholders of a controlled corporation; §§ 26, 206 German Law Regulating the Transformation of Companies: compensation for members or creditors of a corporation or a company in case of incorrect transformation) or by the representative of bondholders who has been elected by the bondholders' assembly (§ 14 German Law on the Common Rights of Bondholders). The mechanism of these rules applies only in very rare cases when the complicated and very special requirements of these provisions are strictly met. A broad application of this or a similar mechanism in other cases by courts without authorization of the parliamentary legislature would be considered a serious infringement of the constitutional right to be heard (see German Constitutional Court, 59 BVerfGE 330, 333-334 [1982]). Even then, the parliamentary legislature could act only in a manner reconcilable with the German Constitution. Moreover, at the present time, according to prevailing opinion in Germany, the need for group actions does not justify the limitation on the right to be heard. Damages class actions for consumers, shareholders or bondholders have been and are being discussed again and again in Germany. But at the present time the infringement of the constitutional right to be heard by negative preclusive effects of judgments or settlements against group members is one of the most important grounds why Germany has not adopted damages group action proceedings.

4

5.          A rather comparable form of representative action that may be brought in

Germany, however, is an action filed by a consumer protection association seeking a

prohibitory injunction.  The policy of vindicating collective rights of consumers is

supported by the European Directive on Injunctions for the Protection of Consumers'

Interests.  See European Parliament and Council Directive 98/27/EC of May 19, 1998 on

Injunctions for the Protection of Consumers' Interests, 1998 O.J. (L 166) 51 (the

"Injunction Directive").  The Injunction Directive authorizes consumer protection entities

to resort to the courts or administrative authorities in member states with actions seeking

to enjoin commercial conduct that harms consumers ("Injunction Actions").  See

generally David J. Schwartz, Loose Teeth in European Union Consumer Protection

Policy: The Injunction Directive and the Mass Default Scenario, 28 Ga. J. Int'l & Comp.

L. 527 (2000).

6.          Implementing this directive, German statutory law provides special

criteria in determining whether to grant a judgment rendered in an Injunction Action

preclusive effect when a case implicating the same facts is subsequently brought by an

individual (Injunction Actions Law of August 27, 2002, Bundesgesetzblatt I 3422, § 11).

If the consumer protection association was the prevailing party in the Injunction Action,

the judgment in favor of the association may be given preclusive effect in a later action

brought by a consumer.  If, however, the consumer protection association did not prevail

in the Injunction Action, a court may not apply claim preclusion doctrine to prevent an

individual from bringing a later action to vindicate his or her rights.  This narrow

construction of the preclusive effect of a judgment on collective consumer rights is the

5

consequence of the aforementioned German understanding of the constitutional right to
be heard. There is nearly no chance that German courts would recognize the negative
preclusive effect of American judgments or settlements against shareholders, when these
judgments are based on the idea of representation in class action proceedings without a
fair chance to opt-out.

7.        Recognition of preclusive effects of American judgments against third
persons in Germany requires correct individual service of process as an indispensable
prerequisite (§ 328 Nö 2 German Code of Civil Procedure). With respect to service of
German nationals by American claimants, Germany requires strict compliance with the
provisions of the Hague Service Convention when the German nationals have their
domicile and residence in Germany (German Federal Supreme Court 120 BGHZ 305,
309-313 [1992]; 141 BGHZ 286, 302-304 [1999]). Service under the Hague Convention
is only permitted in cooperation with German authorities. According to the German
understanding of service of process as a public act of state, service without consent or
judicial assistance of the state where the addressee has her domicile or residence is
considered an infringement of foreign sovereignty and international law (German Federal
Supreme Court 120 BGHZ 305, 310-313 [1992]; 141 BGHZ 286, 302-304 [1999]; see
also German Code of Civil Procedure § 183[1] as revised 2002 which provides direct
service by registered mail only with the consent of the foreign state). Germany has
objected to the use of methods of transmission pursuant to Art. 10 of the Hague Service
Convention which permits service by registered mail solely with the consent of the state
of destination. Only within the European Union direct service of translated documents by

6

registered mail has recently been permitted (Council Regulation on the Service of Process

in Civil and Commercial Matters N6 1348/2000 of May 29, 2000, 2000 O.J. [L 160] 37,

Art. 14).

8.         Under the Hague Service Convention as applied in Germany, the Ministry

of Justice in each of the fifteen German states ("Bundesländer") is designated as the

Central Authority for receipt of requests for service of process. See Hague Service

Convention, at annex n.7a. An applicant seeking to serve a German national must

therefore first determine to which state that German national resides, and then direct the

request for service to that state's Ministry of Justice. The applicant must send to the

Ministry of Justice a request for service of process accompanied by the documents to be

served, a summary of those documents and a certificate form for the requested foreign

authority. See Hague Service Convention, art. 3, 5 and annex "Forms". The Ministry of

Justice will then consider whether the request conforms to the requirements of the Hague

Service Convention, and, if the request is deemed defective, the Ministry of Justice is

required to inform the applicant and specify its objections. See id., art. 4.

9.         If the Ministry of Justice determines that the request complies with the

applicable requirements of the Hague Service Convention, it will normally forward the

request to a local court ("Amtsgericht") in the district in which documents are to be

served (German Law on the Implementation of the Hague Convention on Service Abroad

and the Taking of Evidence Abroad of December 22, 1977, Bundesgesetzblatt I, 3105,

§ 4[2]). The local court will invite the individual who is to be served to come to the court

in order to accept the documents. The local court may also serve the documents by

7

registered mail, although the court will not send by registered mail documents that are not accompanied by a German translation. In addition, if an individual refuses to accept service of an English-only document, he or she has the right to receive a translated version (Hague Service Convention Art. 5[3] and German Implementation Law § 3).

10.        Under the Hague Service Convention, the American applicant may request service or notice by publication (Hague Service Convention Art. 5[1][b]) to avoid the described burdensome procedure. Germany may refuse to comply with this request when the particular method requested is incompatible with German law. German law knows service and notice by publication only under very limited circumstances. According to German Code of Civil Procedure sections 185-188, service by publication is permitted when the address of the person to be served is unknown. But the applicant has to give strong evidence of reasonable efforts to discover the address of the person to be served. In case of judicial assistance for actions in foreign courts it may be for the local courts of each German state to decide on the permissibility of service by publication. An application for service by publication must contain the name of the person to be served and his or her last known residence. German law does not generally provide notice by publication to a large group of creditors. In rare and exceptional cases as in the aforementioned proceedings for the appointment or election of representatives of shareholders or bondholders German law knows notice by publication (e.g. § 306[3] German Stock Corporation Law; §§ 26[3], 206 German Law Regulating the Transformation of Companies; § 6 German Law on the Common Rights of Bondholders). But without a special formal legal authorization service or notice by publication is not

8

permitted and it could be considered a serious infringement of the constitutional right to
be heard.

11.        In the context of a damages class action suit involving large numbers of
potential class members, parties seeking to serve notice upon members of the class
located throughout Germany would essentially have to secure the cooperation of 15
Ministries of Justice, as well as numerous local courts in the districts where members
reside. The right of individuals to refuse documents that are not accompanied by a
German translation would further delay this process.

## CONCLUSION

12.        As the aforementioned discussion makes clear, effectuating proper notice
to residents of Germany who may be included in a U.S. class presents considerable
logistical and practical difficulties. It is my opinion that a German court will not
recognize negative effects of a class action judgment or court confirmed settlement in any
subsequent actions against the Defendants absent the provision of notice to German
shareholders that complies strictly with the Hague Service Convention. My conclusion is
clearly supported by German statutory law that at the present time generally prohibits
courts from granting preclusive effect to judgments in actions of consumer protection
associations that are unfavorable to consumers.

        I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.
Executed this __8__ th day of January 2003.


        ROLF STÜRNER

9

# EXHIBIT  A

# Curriculum Vitae

| | | | |
|---|---|---|---|
| **Name:** | Dr. jur. Rolf Stürner | **Born:** | April 11, 1943 |
| **Address:** | Institut für Deutsches und | **Residence** | Talstraße 31 |
| | Ausländisches Zivilprozeßrecht, | | 78256 Steißlingen |
| | Abteilung I | | Germany |
| | Albert-Ludwigs-Universität | | |
| | Platz der Alten Synagoge 1 | | |
| | 79085 Freiburg | | |
| | Germany | | |
| **Phone:** | 0049-761-203-2163 | **Phone/Fax:** | 0049-7738-298 |
| **Fax:** | 0049-761-203-2165 | | |
| **E-mail:** | izpr1@jura.uni-freiburg.de | | |

**Education:**

*High School:*

1953-1962    Gymnasium Stuttgart Zuffenhausen
             *Degree:* Abitur (graduation from high school)

*Legal:*

1962-1966    University of Tübingen
             *Degree:* First State Examination

1966-1968    Doctorate, Law Faculty of the University of Tübingen
             *Degree:* Doctor iur.

1968-1970    Articled clerk in Baden-Württemberg
             *Degree:* Second State Examination

1976         Habilitation, Law Faculty of the University of Tübingen
             *Degree:* Doctor habil.

**Academic Appointments:**

1976-1992    Professor at the University of Konstanz

1979-1981    Dean of the Law Faculty of the University of Konstanz

1986-1988    Visiting Professor (professeur invité) at the University of Geneva, Switzer-
             land

1992-present Professor at the University of Freiburg – Director of the Institute for German
             and Comparative Civil Procedural Law

| 2000-2002 | Dean of the Law Faculty of the University of Freiburg |
| 2001 | Visiting Professor Harvard Law School |

**Other Academic and Professional Experience:**

| 1982-present | Co-editor of the Juristenzeitung |
| 1985-present | Co-editor of the Zeitschrift für Zivilprozeß (Journal for Civil Procedure) |
| 1989-present | Co-editor of the Zeitschrift für Konkurs-, Treuhand- und Schiedsgerichts-wesen (Journal for Bankruptcy, Trust and Arbitration Affairs) |
| 1996-present | Founding co-editor of the Zeitschrift für Zivilprozeß International (Journal for International Civil Procedure) |

**Other Professional Activities and Memberships:**

| 1983 | Member of the International Association of Procedural Law |
| 1985 | Election and Appointment to the Council of the Association for International and Procedural Law, Comparative Procedural Law and Arbitration |
| 1985 | Scholarship of the Japanese Society for the Promotion of Science (University of Tokyo, Keyo University, etc.) |
| 1985 | Expert Adviser of the Deutsche Forschungsgemeinschaft (German Research Foundation) |
| 1992-1996 | Court Expert of the German Federal Constitutional Court |
| 1992 | Member of the Governing Council of the German Lawyers Association (Deutscher Juristentag) |
| 1993 | President of the Zivilprozeßrechtslehrervereinigung (Association of Austrian, Swiss and German Proceduralists) |
| 1997 | Speaker on the International Conference of the Japanese Association for Civil Procedure |
| 1997 | Honorary Member of the Association of Italian Proceduralists |
| 1997 | Member of the Board of Directors of the German-American Lawyers Association |
| 1998 | Expert Adviser of Unidroit (International Institute for the Unification of Private Law), Rome, for the Project "Transnational Rules of Civil Procedure" |

2

| | |
|---|---|
| 2001 | Co-reporter for the joint project of the American Law Institute, Philadelphia, USA, and Unidroit, Rome, Italy, "Principles and Rules of Civil Procedure" |
| 2002 | Speaker on the Comparative Civil Procedure Conference of the British Institute of International and Comparative Law, London |
| 2002 | Speaker on the Court of Federal Claims 20th Anniversary Conference, Washington |
| 2003 | Invitation as Keynote Speaker on the XII[th] World Congress of the International Association of Procedural Law in Jalapa, Veracruz, Mexico |

3